ROUSMANIERE (HUNT v.).   See Case No. 6,898.

ROUSMANIERE'S ADM'RS (UNITED STATES v.).   See Case No. 16,200.

ROUSSEAU (FRY v.).   See Case No. 5,141.

ROUSSEAU (WILSON v.).   See Case No. 17,832.

## Case No. 12,090.

### The ROVENA.

[1 Ware (309) 313.] [1]

District Court, D. Maine.   April 12, 1836.

SEAMEN—WAGES—FORFEITURE—DESERTION—ENTRY IN LOG BOOK—WHEN TO BE MADE—DISMISSAL—ESTIMATION OF DAMAGES.

1. The desertion of a seaman during the voyage, by the general maritime law, works a forfeiture of all wages antecedently earned.

2. By the statute of July 20, 1790, c. 56, § 5 [1 Story's Laws, 104; 1 Stat. 133, c. 29], an absence of forty-eight hours without leave, is made conclusive evidence of desertion.

[Cited in Burton v. Salter, Case No. 2,218; The Quintero. Id. 11,517.] .

3. To prove such absence, a proper entry in the log-book is indispensable, though not conclusive evidence.

'[Cited in Spencer v. Eustis, 21 Me. 521.]

4. The entry, to support the statute forfeiture, must be made the day the absence takes place, and it must state the name of the seaman, and that he was absent without leave.

[Cited in The Lillian M. Vigus, Case No. 8,346.]

5. An entry that the crew were absent, or that all the crew were absent, will not be sufficient, without mentioning the name of the seaman against whom the forfeiture is proposed to be enforced.

6. To constitute a desertion under the general maritime law, there must be a quitting of the vessel with the intention of abandoning her altogether and not returning. A mere leaving the vessel without permission, is not desertion.

[Cited in The John Martin, Case No. 7.357.]

7. If a mariner is dismissed by the master before the termination of the voyage without just cause, he is entitled to damages, which will be given by the admiralty in a suit for his wages.

[Cited in Jay v. Almy, Case No. 7.236; Bush v. The Alonzo, Id. 2.223; Worth v. The Lioness No. 2, 3 Fed. 925.]

8. The rule for estimating the damages, by the marine law, is ordinarily the allowance of full wages to the prosperous termination of the voyage. But this is not an inflexible rule, and may be varied to meet the justice of the case.

This was a libel for wages. The libellant alleges that he shipped at Portland, November 4, 1835, for a voyage to Cuba, and thence to her port of discharge in the United States, and thence back to Portland; ·that she made the voyage to Cuba, and thence went to Wilmington, where the voyage was changed, and he shipped for another voyage on the 28th of December, to Cuba, and thence to her port of discharge in the United States, and thence to Portland; that he faithfully did his duty as a mariner in said brig until her arrival in Boston, where "he was taken unwell and unfit for duty, and was relieved and discharged from further duty by the chief mate of the brig, with the consent of the captain." He further alleges that the captain [Hunt] refused to permit him to remain in said brig, but soon after leaving the wharf at Boston

1 [Reported by Hon. Ashur Ware, District Judge.]

for Portland, forcibly expelled him from the same, and put him on shore on Castle Island, in the harbor of Boston, and now refuses to pay him the balance of wages remaining due; and he prays for process against the vessel to enable him to recover his wages, and for such further relief as may be just and meet. The answer of the owners admits the contract, and that the libellant performed the voyage until the arrival at Boston, but alleges that at Boston he deserted the vessel, and thereby incurred a forfeiture of his wages; and that the libellant after having deserted, on her passage to Portland violently and with force attempted to enter the vessel, violently attacked the captain, and that he, in self-defence and for the safety of the vessel, was under the necessity of putting him on shore.

A number of witnesses were examined in support of the allegations of the libel and answer, and the case was submitted by the counsel on the evidence, without argument.

R. A. L. Codman, for libellant.
J. D. Kinsman, for respondent.

WARE, District Judge. This case involves some questions on which it would have been satisfactory to me to have had the aid of an argument from the learned counsel. But they excuse themselves for want of time at this busy period of their forensic labors, and with other pressing engagements upon their hands, to examine the questions which are supposed to arise in the case, and choose to submit it to the unaided investigation of the court, rather than rely upon arguments which must be nearly extemporary and without an examination of authorities. The libellant originally shipped for a voyage to Cuba, and back to her port or ports of discharge in the United States, and thence back to Portland. But on the arrival of the brig, in the course of that voyage, at Wilmington, instead of returning to Portland, a new voyage was undertaken to Cuba, and thence back to her port of discharge in the United States, and thence to Portland. The libellant shipped for this new voyage, and it is under this latter contract that the wages were earned which are the subject of this suit. The brig made the voyage, and the libellant returned in her to Boston, whence the brig returned to Portland, the termination of the voyage. It is admitted that the wages were earned and ought to be paid unless they are forfeited by what took place at Boston. The answer indeed alleges a single instance of misconduct subsequent to the alleged desertion, but does not insist upon it as a cause of forfeiture, which it cannot be pretended to be independent of the supposed desertion.

The first question presented by the allegations of the answer is, whether there was a desertion at Boston. But this presents itself under a double aspect; first, whether there was a desertion within the meaning of the act of July 20, 1790, for the government and regulation of seamen, in the merchant service; and secondly, whether, independent of any such statute provision, there was a desertion within the meaning of the general maritime law. By the 5th section of the statute it is provided that: "If any seaman, &c., shall absent himself from on board the ship or vessel, &c., without leave of the master or officer commanding on board, and the mate or other officers having charge of the log-book, shall make an entry therein, of the name of such seaman or mariner on the day on which he shall so absent himself, and if such seaman or mariner shall return to his duty within forty-eight hours, such seaman shall forfeit three days' pay for every day he shall so absent himself, to be deducted out of his wages; but if such seaman or mariner shall absent himself for more than forty-eight hours at one time, he shall forfeit all the wages due to him, and all his goods and chattels which were on board of said ship or vessel, or in any store where they may have been lodged at the time of his desertion, to the use of the owners," &c. As this statute is highly penal, the owner who wishes to enforce it must bring his case within the precise words of the act. When a statute is purely remedial and goes to support and to uphold rights, the presumed intention of the legislature is, that it should receive a liberal interpretation, and be applied to cases which are within the reason of the law, although they may not be within its precise words. But when a statute imposes penalties and a forfeiture of rights, no such intention is presumed. The court is not authorized to extend the operation of the law beyond the clearly expressed will of the legislature, for the purpose of carrying into full effect its supposed policy. The operation of the statute cannot be enlarged by interpretation, so as to create penalties and forfeitures by implication. If the case is not within the words of the law, according to their natural and obvious import, it is not supposed to be within its policy, or within the intention of the lawmakers. Before the owners can call on the court to enforce this forfeiture under the statute, they must show not only that there was an absence from the vessel without leave, but that an entry of such absence was made in the log-book, on the day when it took place. An entry on a subsequent day is not a compliance with the law. The entry must mention the name of the mariner against whom the forfeiture is to be enforced. It is not sufficient to say generally that the crew, or even that all the crew were absent. The entry must state that the absence was without leave, not merely that the seaman was absent, and, finally, there must be one continued absence of forty-eight hours.

Does the case which is presented by the evidence come within the requirements of the law? The evidence on some points is,

to a considerable extent, contradictory and not easily reconciled. But the whole testimony, as well that produced by the respondents as by the libellant, conclusively proves that Winslow was not absent at any one time forty-eight hours. Estell, a witness for the libellant, says that he was with Winslow the whole time that he remained in Boston, and that he was not absent from the vessel at any one time more than twelve hours. But, without relying on Estell's testimony, though I am far from intending to intimate an opinion that he is not entitled to full credit, it appears from the log-book that the brig came to the wharf about 12 o'clock, on Wednesday, the 16th. The mate states that the libellant did not leave the vessel until two o'clock, and that he saw him on board again on Friday, the 18th, at ten o'clock in the morning. Here was, then, according to the evidence offered by the respondents, an absence at most of but forty-four hours. This was the longest absence that can be pretended, for the vessel sailed for Portland, on Saturday at twelve o'clock, and at two o'clock of that day, Winslow was forcibly expelled from the brig by the master, and put on shore on Fort Independence. Taking then the most unfavorable view of the libellant's case, here was not an absence which incurred an entire forfeiture of his wages. But there is another insuperable difficulty in the way of the defence set up. A proper entry in the log-book is an indispensable prerequisite, and it has always been so held, to the enforcing of this forfeiture under the statute. The entry in the log-book on the 16th, is, that "the crew denied doing more duty, and went ashore." The name of the libellant is not mentioned; it is not even said that all the crew went ashore. On the 17th, indeed, there is an entry, "all the crew ashore." But this cannot help the infirmity of the entry of the 16th, which is the one which the statute requires, and is the only one which can support this defence. But even if the second entry might be invoked in aid of the first, I should not hesitate to hold that it is still incurably defective. When the statute says that the name of the seaman shall be entered on the log, the court has no authority to say that these words are an unmeaning pleonasm, or that the specific directions of the statute may be supplied by something that is equivalent. But there is a further objection to this entry, even if we could overcome the difficulty that the name of the libellant is not mentioned. It is not stated whether the crew were absent with or without leave. When the statute makes this entry an indispensable part of the evidence against the seaman, we must suppose that the legislature intended that the log-book should show that the absence was attended by those circumstances which constitute the offence, and on account of which the forfeiture is inflicted. An absence from the vessel is not punished unless it be without leave.

The entry must therefore state that it was without leave, or it will not support a decree of forfeiture. This is the construction which has been given to the statute. Abb. Shipp. (Am. Ed.) p. 468, note; Cloutman v. Tunison [Case No. 2,907]. And this particularity in the entry is not required without reason. It is but a safe and prudent precaution to require all the facts which constitute the offence to be entered on the log at the time, were it for no other reason than to prevent an aggravated character from being given, by the gloss of parol testimony, to an act which might at the time have been considered as a trivial offence. Persons who are much conversant with these maritime controversies, need not to be informed that the memory of some bygone misconduct, actual or supposed, may be aided by a subsequent grievance, and that a later wrong, through the quickened sensibility of the party offended, may be made to throw its shade back and darken the hues of a previous fault. The law, therefore, looks to the description of the offence as it is entered on the log, the day on which the alleged desertion took place, because this shows how the act of the seaman was considered at the time. And this it makes indispensable, though not conclusive evidence. In whatever point of view the facts are regarded, I am satisfied that here has been no statute forfeiture of wages. But independently of the statute, by the general maritime law, desertion during the voyage is followed by a forfeiture of all wages antecedently earned. Abb. Shipp. 462–468; 1 Valin, p. 535; Consulat de la Mer. cc. 157, 158, 268. The act of congress is not held to have repealed or modified the maritime law except in the particular case for which it provides, in which it makes an absence of forty-eight hours, without leave, conclusive evidence of desertion, when by the general law it would only be presumptive evidence of the fact. In other respects it leaves the maritime law in its full efficiency. Cloutman v. Tunison [supra]. If, then, there was a desertion in the sense of the general maritime law, however hard it may operate on the libellant, the owners may insist on the forfeiture. It has been justly said that the marine law is not the law of any particular country, but a law common to all nations which are engaged in maritime commerce. It does not arise out of the domestic exchanges or home trade of any one people, but grows out of the intercommunication of the citizens of different countries, and is made up of the usages and traditions of the trading part of all nations which are conversant in commerce on the high seas. It is in these immemorial usages and traditions that we are to look for the true principles of this law. They have in different places and at various times been embodied into the form of written codes. If we look into these digests of the customs of the sea, we shall find that desertion, in the

sense of the marine law, is something more than merely leaving the ship without permission.

By the Laws of Oleron the seamen are allowed, when the ship is safely moored at the wharf. to go ashore without the master's consent, if they return seasonably. Articles 5, 21. And yet Cleirac, in his Commentary, says that the ordinances are very severe on men who abandon the ship altogether; qui manquent tout a fait; that for the first offence they are punished by whipping, and for the second by a more severe punishment. Us et Coutumes de la Mer, pp. 21, 439. The Laws of Wisbuy allow one or two seamen at a time to go on shore and stay a short time, but not to remain ashore over night without the master's leave. Articles 4, 36. But if a seaman deserts, and carries away what he has received from the master, he is liable to the punishment of death. Article 62. The Hanseatic Ordinance provides that deserters shall be punished by branding on the cheek, and in some cases by death, but a temporary absence without leave is punished only by a pecuniary penalty. Ord. 1614, tit. 3, arts. 6, 7, 18, 23, 25. The Ordinance of Charles V. (1551), makes the same discrimination between an unauthorized temporary absence from the ship, and a desertion. Articles 6, 7, 9. So, also, do the Laws of Hamburgh. A broad and palpable distinction is made between a simple absence from the vessel without leave, and absconding with the intention of not returning, but of abandoning her altogether. It is the latter offence only which constitutes desertion, and is visited with severe penalties, while the former is considered, according to circumstances, either as entirely venial, or as meriting, at most, but a punishment comparatively slight. The cruel punishments of the old codes have fallen into disuse, but the general principles embodied in them remain and are still acknowledged as law by all commercial nations. The mere leaving the ship without permission, does not, in the sense of the marine law, constitute desertion. This offence is committed only when a seaman absconds or leaves with the intention of abandoning her altogether, animo ad navem non revertendi, as it is expressed by Kuricke in his Commentary on the Revised Hanseatic Ordinance. Heinn. Fasciculus, Script. de jure Nautico, p. 745. And so the law is held to be by the circuit court, in the recent case of Cloutman v. Tunison before referred to. If this be the true principle, then it is perfectly certain that the libellant has not incurred the penalty of desertion. So far from exhibiting any intention of abandoning the vessel, he left his clothes and bedding and a small adventure on board, returned to the vessel every morning before breakfast, and once or twice more in the course of the day, and slept on board the night before she left Boston for this port. I am entirely satisfied that the penalty of desertion has not been incurred either under the statute or by the general maritime law.

Another question remains, which is, whether the libellant has incurred any minor forfeiture. Although there has been no desertion, if he neglected his duty and absented himself from the vessel without any justifiable excuse, and against the will of the master, the law will punish his misconduct by a proper deduction from his wages. And here, I am sorry to say that the evidence is so contradictory that I cannot think of attempting to reconcile it. There are, however, some facts which are either admitted or are not susceptible of any reasonable doubt. Winslow was on board the vessel during the whole of both voyages, and did his duty in a manner entirely acceptable to the master, up to the time of the arrival in Boston, and till the brig was made fast to the wharf. He indeed seems to have had a larger share of the master's confidence than any other hand on board. They had a rough and boisterous time on the passage home. Winslow, two or three days before their arrival, sprained his foot, and being exposed to the water, took cold in it, so that on his arrival it was swollen, and in a state of high inflammation. Both his wrists were badly chafed, the skin worn off, and the flesh laid bare on a spot of considerable size, by hard service in the cold and wet. After the vessel was moored at the wharf, he showed his wrist and foot to the mate, and asked to be excused from further services, as he felt unable to labor. Two of the witnesses state that the mate told him that he was unfit for duty, and ought to be excused. But the mate denies this, and says he ordered him to turn to. He says that he saw his wrists, and believed one of them was a little chafed, and that his foot was a little red on the instep, but he cannot say whether it was swollen. This was about a fortnight before the hearing, when Winslow exhibited his wrists and his foot and from their appearance at that time, I cannot say that I feel any doubt which of the witnesses is entitled to the most credit in this part of their testimony. The wrist bore evident marks of having been more than a little chafed, his foot was still red from the recent inflammation, and on the instep, where it had suppurated, there remained a cavity about an eighth of an inch deep, large enough to admit the end of your finger. These are vestigia that may safely be believed. Under these circumstances, if the libellant was not excused from further duty, I think that he ought to have been. Indeed, there was little for any of the crew to do, as the master, before the brig came up to the wharf, had employed lumpers, according to the custom of the port, to discharge the cargo. During the whole period that the brig lay at Boston, the master was employed in delivering her cargo, and might easily have known where the libellant was, if he had made any inquiries. But he made none. No complaint was made

of his absence, and he was never ordered to go to duty. This entire silence on the part of the master, may, under the circumstances of the case, be construed as assenting to his absence, and authorizing it.

The libellant claims also further damages beyond the amount of wages due. After the arrival at Boston the cook left the vessel, and there was no cooking and no fire on board during the period the brig remained there. The master is bound to provide board for his men, whether they are able to do duty or not, and if he did not provide it on board the vessel, there can be no doubt that this is a proper charge on the owners. Whether the libellant is entitled to claim the expenses of his return home, depends on the fact whether he was wrongfully or rightfully expelled from the vessel. If a seaman is dismissed before the termination of the voyage, without just cause, he is entitled to damages for this wrongful act. At common law, he can recover these damages by a special action on the case. But a court of admiralty, whose modes and forms of practice have more flexibility, will give these damages in a simple suit for wages. Emerson v. Howland [Case No. 4,441]; The Exeter, 2 C. Rob. Adm. 261. The rule by which this compensation is ordinarily measured by the maritime law, is to allow full wages to the prosperous termination of the voyage, deducting in some cases what the seaman may have earned in the intermediate time, or adding the expenses which he may have incurred in returning home. Abb. Shipp. 443, and the cases cited in the note to the American edition. This question was largely and learnedly discussed in the case of Emerson v. Howland [supra], and the conclusion to which the court came was, that this rule might be varied to meet the justice of the case, taking care that the seaman should receive a just compensation for the damage he sustained. But in this case, if the libellant is entitled to any damages, the general rule will be the equitable one.

Does the evidence make out a case of wrongful dismission? It has been already stated that the master employed lumpers to discharge the vessel before she came to the wharf; that he took no notice of the absence of the libellant and the rest of the crew, and without making any inquiries for them, he proceeded to hire other men to bring the brig to Portland. It is in proof, also, that the libellant came to the vessel every day; that he was there, with others of the crew, but a short time before she sailed; that inquiry was made of the mate when she would sail, but no satisfactory answer was obtained; that he returned to his boarding-house to dine, and hastened back and found that the vessel had already left the wharf. He hired a boat, and with one other of the crew, followed the brig and overtook her about a mile from the wharf. The master prohibited and resisted their entering the vessel. With some difficulty, but with no more violence than was necessary to overcome the resistance, they got on board. The captain, in a state of high excitement, called for his pistols and his gun, and ordered them to be set on shore. They quietly submitted, and were landed on Fort Independence, and shortly after the libellant returned to Portland.

The whole conduct of the master, both in his entire silence and apparent indifference with respect to the absence of the libellant and the rest of the crew, while in Boston, as well as in the expression of passion when the libellant came on board the vessel, is difficult to be explained. As to the pretext that he was afraid of a mutiny from the presence of Winslow, with whom he had sailed two voyages without a single complaint of any kind having been made against him, and who it is not pretended had ever shown a mutinous or refractory disposition, I find it impossible to give to it the least credit. His conduct is, to me, inexplicable, unless a key be found to it in the remark of one of the witnesses, that the crew suspected his intentions to have been to leave them in Boston and get clear of paying them their wages by a charge of desertion. Even if the libellant had forfeited his wages by misconduct, the master was bound to have received him back on his repentance and tender of amends. A master grossly misconceives the obligations resulting from his relations to the owners and crew, if he thinks he may watch for occasions to inflict forfeitures of the hard earnings of his men. It is his duty, when he sees any of his men in danger of exposing themselves to penalties from levity or thoughtlessness, to caution them against it; and exercise the large discretionary authority with which the law invests him, and which places him, in some measure, loco parentis, in relation to his men, with something of parental kindness, for the benefit and protection of the rights of his crew, as well as for their government. This is the spirit of the marine law, which, although it abounds in penalties, does not seek occasions to inflict them; but when seamen have been guilty of a real delinquency, sedulously favors repentance, and gladly remits a forfeiture when a mariner, with a due sense of his fault, returns to duty. And this is also the spirit in which the marine law has always been administered by courts of maritime jurisdiction. This humane and indulgent policy of the law, when a large and liberal view is taken of the interests of maritime commerce, is not more beneficial to mariners than owners. If the crew, by some hasty ebullition of passion, near the close of a long voyage, are betrayed into an act of imprudence, by which they incur a forfeiture of their whole wages, and they know that by no repentance and subsequent fidelity of service they can reinstate themselves in their rights, they will lose all interest in the preservation of the ship and cargo. They will have no motive for extra exertion in the hour of peril, beyond that of preserving their own

lives. It is extremely obvious, how hazardous such a state of things may be to the interest of owners. But such is not the policy of the marine law. It regards with practical wisdom the character of the subjects it has to deal with; men nurtured and bred in the midst of dangers—fearless, intrepid, and daring, beyond the ordinary measure of gallantry that belongs to any other class of the community, but thoughtless, hasty, and choleric; their characteristic traits all striking and salient; looking forward during their perilous service to the reward which is hoped for at its close, with as much expectation as other men, though heedless and lavish in expending it; the law, originally framed by men deeply interested and conversant in maritime commerce, has prudently connected by all practicable means the interest of the crew with the successful and prosperous termination of the voyage.

I am perfectly clear in the opinion, on the best consideration that I have been able to give the subject, that the master was not justifiable in excluding the libellant from the vessel and leaving him at Boston. I shall decree full wages until the return of the vessel to Portland, and additional damages to cover the expenses of his board on shore, and of his return home.